SNITZLER-WARNER CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 12964, 19220.   Promulgated May 2, 1929.

*Harold Dudley Greeley, Esq.*, for the petitioner.
*J. L. Backstrom, Esq.*, for the respondent.

350

364

**OPINION.**

SIEFKIN: The petitioner contends that during the years 1920 and 1921 it was a personal service corporation and was exempt from taxation. In the alternative, it contends that its tax should be computed as provided in section 328 of the Revenue Acts of 1918 and 1921.

Section 218 (e) of the Revenue Act of 1918 and section 218 (d) of the Revenue Act of 1921 provide that personal service corporations shall not be subject to taxation.

Section 200 of the Revenue Acts of 1918 and 1921 defines a personal service corporation as follows:

The term "personal service corporation" means a corporation whose income is to be ascribed primarily to the activities of the principal owners or stockholders who are themselves regularly engaged in the active conduct of the affairs of the corporation and in which capital (whether invested or borrowed) is not a material income-producing factor; but does not include any foreign corporation, nor any corporation 50 per centum or more of whose gross income consists either (1) of gains, profits, or income derived from trading as a principal, or (2) of gains, profits, commissions, or other income, derived from a Government contract or contracts made between April 6, 1917, and November 11, 1918, both dates inclusive.

The petitioner during the years in controversy was not a foreign corporation, nor did 50 per centum or more of its gross income consist of gains, profits, commissions, or other income derived from a Government contract or contracts made between April 6, 1917, and November 11, 1918. The petitioner's business was that of a general advertising agency. It reserved advertising space in advertising media for clients and gave advice on advertising in general. Its income was not derived from trading as a principal.

During the years 1920 and 1921 all of its seven stockholders were regularly engaged in the active conduct of the affairs of the corporation except Ursula M. Snitzler, who owned 5 per cent of the stock of petitioner from September 15 1920, to December 31, 1921. She devoted about one-tenth of her time to the affairs of the petitioner. However, the principal stockholders of petitioner were engaged in the active conduct of the affairs of petitioner.

The statute provides that in order to entitle a corporation to personal service classification its income must be ascribable primarily to the activities of its principal stockholders.

During the year 1920 petitioner employed 37 persons who were not stockholders of petitioner. Only 10 of these remained throughout the year. The number who remained during a part of the year was equivalent to 9 persons employed for the whole year. The average was therefore 19 employees. In 1921 petitioner had 33 nonstockholding employees of which number only 9 remained throughout the year. The number who remained during part of the year was equivalent to 8 persons employed for the whole year. The average number of employees in 1921 was, therefore, 17. The most of these were engaged in general office duties. During 1920 petitioner employed 3 copy writers, none of whom remained during the full year. During the year 1921 there was 1 copy writer employed during the whole year and 4 others who worked only a part of the year. In 1920 there was a period of 3 months when petitioner was without the services of a copy writer.

No employee of petitioner ever secured new business for petitioner. The stockholders alone solicited business. No nonstockholding employee ever held a conference with a client of petitioner concerning the client's advertising, although sometimes a copy writer would accompany a stockholder at a conference in order to better understand the type of work desired. The basic idea of an advertisement was evolved by conference between a stockholder and the client and all details of carrying out the advertising plan were either done or supervised by a stockholder. The retention of clients or the acquisition of new clients was not attributable to the nonstockholding employees of petitioner. The particular employees of petitioner were not essential to the business. This is evidenced by the fact that there

was a turnover of about three-fourths of petitioner's employees in each of the years 1920 and 1921.

We find that the income of petitioner during the years 1920 and 1921 was ascribable primarily to the activities of the principal stockholders.

To be entitled to personal service classification petitioner must meet another requirement of the statute. Capital (whether invested or borrowed) must not have been a material income-producing factor.

The balance sheets of the petitioner for the years in question indicate very clearly that there was present in the business considerable capital, both invested and borrowed. The question for decision is whether this capital was a material income-producing factor.

The fact that a business has capital, or in certain contingencies might require capital, is not sufficient to deny personal service classification, if, in fact, capital is not a material income-producing factor. *S. A. Conover Co.*, 6 B. T. A. 679.

The general practice of the petitioner was to pay bills to publishers after receiving payment from clients. However, in some cases, the petitioner did pay publishers amounts due from clients before the clients paid petitioner. The evidence discloses that throughout the year 1920 the average amount petitioner expended to pay publishers' bills, before receiving payments, either by notes or cash, from clients was $66,030.22 and that during the year 1921 this amount was $35,504.86.

In addition to this the petitioner, in the year 1920, received notes from its clients and advanced money to the publishers. The average credit extended by this means to clients throughout the year was about $2,522.

In 1921 it received both notes and trade acceptances. The average credit extended by this means to clients throughout the year was about $38,143.

The total average capital used, therefore, to extend credit to clients was about $68,522.22 in 1920, and about $73,647.86 in 1921.

Did the payment of publishers' bills by petitioner to the extent set forth above affect the volume of petitioner's business in such manner that it might be said that capital was a material income-producing factor? We believe not, when we consider that the gross income of the petitioner for the years 1920 and 1921 was $183,527.80 and $235,381.65, respectively, and that the gross billings for space for the years 1920 and 1921 amounted to $1,338,687.74 and $1,359,-510.33, respectively.

During the year 1920 petitioner received no income directly from the use of capital. During the year 1921 it received taxable interest

in the amount of $3,382.13, and it retained $2,079.87 of the cash discounts allowed for payment of clients' bills to publishers at the due dates. However, this income which is attributable directly to the use of capital is small when compared to the gross income for the year 1921.

The petitioner also took notes from clients instead of cash, and discounted them, but this does not constitute an income-producing use of capital.

We conclude that capital was not a material income-producing factor in petitioner's business during the years in question.

The petitioner is entitled to personal service classification for each of the years 1920 and 1921.

Reviewed by the Board.

*Judgment will be entered for the petitioner.*